**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CRIMINAL NO.  3:05CR92**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| | ) | |
| **MARK S. COX** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **CAROL ANN COX,** | ) | |
| | ) | |
| **Third-Party Petitioner.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the petition of Third-Party

Petitioner Carol Ann Cox opposing forfeiture and the Government's

response, motion to dismiss or, in the alternative, for summary judgment.

For the reasons stated herein, the Petition is granted, and the Preliminary

Order of Forfeiture will be appropriately amended.

# I. FACTUAL BACKGROUND

This matter arises from the Government's seizure of approximately $1.06 million from the Defendant Mark Cox's bank account at BB&T, account number 6828.  The seizure was effectuated pursuant to a plea agreement between the Defendant and the Government to which he agreed to plead guilty to bank fraud, health care fraud, and money laundering.  As a part of the plea agreement, Defendant also agreed to forfeit "the balance on account in BB&T Account Number . . . 6828, but not less than $1,065,541.96, which are the direct proceeds of the bank fraud offense[.]"  **See, Plea Agreement, filed April 8, 2005.**  The Petitioner asserts that she is entitled to approximately $812,000 of the funds seized from such account on the grounds that she is a bona fide purchaser of the funds, having been awarded such amount by an arbitrator during the distribution of the marital estate.

## A. Separation of Defendant and Petitioner

Petitioner and Defendant were married in 1989 and separated on January 7, 2004.  **Stipulations for Ancillary Proceeding ("Ancillary Stipulations"), filed March 27, 2006, ¶¶ 4-5.**  Defendant and Petitioner

initially attempted the collaborative law process to resolve their end-of-marriage issues, entering into a "Collaborative Law Agreement" in March 2004 memorializing such attempt. *Id.*, ¶ 8. In the Collaborative Law Agreement, Defendant and Petitioner agreed that if the collaborative process was unsuccessful, any unresolved issues – including distribution of the marital estate – would be submitted to binding arbitration under the North Carolina Family Law Arbitration Act, N.C. Gen. Stat. § 50-41, *et seq*. ("NC Arbitration Act"). **Exhibit 1, Collaborative Law Agreement, *attached to* Ancillary Stipulations, ¶ 8.** The NC Arbitration Act makes such an agreement to arbitrate "valid, enforceable, and irrevocable except with both parties' consent." **N.C. Gen. Stat. § 50-42(b).** When the collaborative process failed, Petitioner demanded arbitration. **Ancillary Stipulations, ¶¶ 9-10.**

The arbitrator held six days of hearings and issued his written decision on February 24, 2005. **Exhibit A, Judgement re: Equitable Distribution and Order re: Child Support and Alimony ("Arbitration Decision"), *attached to* Third Party Petition Opposing Forfeiture, filed May 10, 2005; Ancillary Stipulations, ¶ 18.** The arbitrator made specific findings regarding the assets and liabilities of Petitioner and Defendant,

and made a specific award of each asset or liability in the equitable distribution decision. *See*, **Arbitration Decision, ¶¶ 5-33.** Neither party voluntarily relinquished his or her respective rights in any portion of the marital estate. **Ancillary Stipulations, ¶ 17.**

Included in the marital estate was an asset labeled "Wachovia Money Market Account # 8391."[1] **Arbitration Decision, ¶ 22.** These funds were the proceeds of Defendant's sale of his 70 percent ownership interest in Southeast Medical Management ("SEMM") and his interest in the building in which SEMM was located. After taxes, the net proceeds of this sale were $1,670,338.09. The arbitrator made the following findings and distribution in regards to this particular asset: (1) the account has "a present balance of approximately $1,062,000;" (2) "Husband shall receive $250,000 of the current balance;" and (3) "all remaining funds in the account shall go to Wife." *Id.* Removing Defendant's portion of the awarded balance, Petitioner received all right, title, and interest to approximately $812,000 from this account.

---

[1] The various accounts involved in this case will be identified by the last four digits of the account number.

**B. Defendant's Relevant Criminal Conduct**

Defendant, a licensed chiropractor operating in the Western District of North Carolina, was alleged in a bill of information to have committed bank fraud, health care fraud, and money laundering.  ***See*, Bill of Information, filed April 8, 2005.**  Relevant to this ancillary proceeding is count one of the information alleging the Defendant "knowingly and unlawfully executed and attempted to execute a scheme and artifice to defraud Wachovia Bank . . . and to obtain approximately $1.9 million . . . by means of false and fraudulent pretenses and representations" in violation of 18 U.S.C. § 1344.  **Bill of Information, filed April 8, 2005, at 3-4.**  The fraudulent activity was alleged to have occurred between May 1, 2003, and November 1, 2003.  **Ancillary Stipulations, ¶ 2.**

According to the information, Defendant persuaded another individual ("J.V.P.") to purchase his interests in SEMM and the building in which SEMM was located.  To effectuate the sale, Defendant and J.V.P. sought a loan of approximately $2 million from Wachovia Bank.  Wachovia issued the loan but did so only because Defendant and J.V.P. made numerous materially false representations to Wachovia.  **Bill of Information, at 3, ¶¶ 16-18; Ancillary Stipulations, ¶ 2.**  The proceeds

Defendant received as a result of this fraudulently obtained loaned – which J.V.P. used to purchase SEMM and the building from Defendant – were deposited into Wachovia Money Market Account # 8391. ***See*, Arbitration Decision, ¶ 22.**

On the same date the information was filed, Defendant entered into a plea agreement with the Government. ***See*, Plea Agreement; Ancillary Stipulations, ¶ 1.** In the plea agreement, Defendant admitted his guilt in the bank fraud and agreed "not to contest the forfeiture of $1,065,541.96 . . . which are the direct proceeds of bank fraud." **Plea Agreement, ¶¶ 1, 6(a).** More specifically, Defendant agreed to forfeit[2] "the balance on account in BB&T Account Number . . . 6828, but not less than $1,065,541.96, which are the direct proceeds of the bank fraud offense, as alleged in Count One of the Bill of Information[.]" ***Id.*, ¶ 23(a).**

---

[2] Although it should go without saying, "a defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own, for the obvious reason that he cannot agree to forfeit property that belongs to someone else." ***United States v. Nava*, 404 F.3d 1119, 1133 (9ᵗʰ Cir. 2005) (internal quotations and citations omitted).**

## C. Petitioner's Knowledge and Lack of Criminal Involvement

Petitioner was made aware "in the late winter/early spring of 2004 . . . that defendant believed he was being investigated for health care fraud." **Ancillary Stipulations, ¶ 32.** Petitioner's counsel subsequently received a letter from Defendant's domestic counsel (and received by Defendant's domestic counsel from Defendant's criminal counsel in Florida) explaining the basic provisions of forfeiture law and its application to health care fraud. *Id.*, **¶¶ 35, Exhibit 9.** However, "defendant refused to discuss any specifics" regarding the health care fraud allegations, and "[d]uring the arbitration proceedings, both at his depositions and at hearings, defendant claimed he was innocent of any health care fraud." *Id.*, **¶¶ 33, 37.** Furthermore, witness Al Robinson[3] gave his opinion during the arbitration hearing "that defendant had not violated any health care laws and that defendant would not be indicted." *Id.*, **¶ 37.**

---

[3] Al Robinson "is a retired special agent for the Federal Bureau of Investigations ("FBI") who formerly worked on health care fraud investigations . . . .  Robinson was hired by defendant to conduct a parallel investigation to the federal government's investigation and to interview witnesses and to monitor the federal government's case against defendant." **Ancillary Stipulations, ¶ 37.**

Although she was aware that Defendant was under investigation for health care fraud, there is no question that prior to the unsealing of Defendant's plea agreement (and the remainder of his file), "neither [Petitioner] nor her counsel knew about any assertion of bank fraud or other illegal conduct by defendant except health care fraud." *Id.*, **¶ 40.** There is likewise no question that Petitioner "had no involvement in any of the actual or alleged criminal activity which led to the charges against defendant." *Id.*, **¶ 3.** Finally, the parties have stipulated that "[n]either the government nor [FBI Special Agent Tim] Parker informed Ms. Cox of the criminal investigation into the Wachovia loan prior to the seizure of the subject funds pursuant to the preliminary order [of forfeiture] in this case." *Id.*, **¶ 44.**

**D. Relationship between the Wachovia and BB&T Bank Accounts**

According to the Government, the balance showing in BB&T Account # 6828 at the time of seizure consisted almost exclusively of the bank fraud proceeds originating in Wachovia Money Market Account # 8391.  ***See,*** **Plea Agreement; Preliminary Order of Forfeiture and Order to Seal ("Preliminary Forfeiture Order"), filed April 11, 2005.**  Any funds that

moved to BB&T Account #6828 from Wachovia Money Market Account # 8391, however, passed through at least two other bank accounts.  A brief summary of Defendant's movement of funds appears as follows:

(1) Following disbursement of the fraudulently obtained loan, Defendant deposited $1,670,468.51 into **Wachovia Account # 8391** on November 26, 2003, of which all but $130.42 came from the loan (*i.e.*, $1,670,338.09 of the deposit was fraudulent loan money).  Various transactions took place involving this account between November 2003 and September 2004.  In total, *excluding* the transfer of $750,000 from this account to the account discussed below on June 14, 2004, the sum of the transactions over this 10-month period were: (i) credits, transfers to, or deposits into this account totaling approximately $63,000; and (ii) withdrawals, debits, and transfers from this account totaling approximately $828,000.  The account was closed on October 7, 2004.

(2) Defendant opened **First Charter Account #0922** on June 14, 2004.  The account was opened with six wire transfers totaling $1,966,245.80.  This amount included $750,000 transferred from **Wachovia Account # 8391** on June 14, 2004.  Over a two-day period (June 14 and 15), Defendant deposited approximately $2.7 Million into this account.  Subsequent transactions between June 16 and June 30 resulted in additions to the account of approximately $192,000, and debits/transfers/withdrawals of slightly over $1.5 Million.  On July 1, 2004, deposits/transfers/debits were executed that, in the aggregate, resulted in approximately $1.1 Million leaving this account.  The majority of this $1.1 Million is represented by a transfer of $750,000 from this account to **First Charter Account # 3763**.

(3) Defendant opened **First Charter Account # 3763** on July 1, 2004, with his transfer of the $750,000 from First Charter Account # 0922.  Subsequent deposits, etc., into this

account between July 2, 2004, and March 7, 2005, totaled $543,331.87. Debits and other withdrawals totaled $219,083.55. The balance on First Charter Account # 3763 as of March 7, 2005, was approximately $1.06 Million. On March 8, 2005, Defendant transferred $1,064,679.50 into **BB&T Account # 6828**, and closed this First Charter account.

(4) **BB&T Account # 6828** is the account from which the Government is seeking forfeiture of $1,065,541.96.

*See*, **Affidavit of T. Randolph Whitt,** *attached to* **Petitioner's Motion for Leave to File Affidavit in Ancillary Proceeding, filed April 17, 2006;** *see also*, **Affidavit of Special Agent Cathleen Whiteman,** *attached to* **Government's Motion for Leave to File Affidavit in Ancillary Proceeding, filed April 11, 2006.**

**E. Preliminary Order of Forfeiture, and Third-Party Petition**

On April 11, 2005, following the entry of Defendant's guilty plea, the Government moved for a preliminary order of forfeiture. *See*, **Ex Parte Motion for Preliminary Order of Forfeiture (Including Seizure Authority) and Motion to Seal, filed April 11, 2005.** United States District Court Judge Graham C. Mullen signed the Order on April 11, 2005, allowing the seizure of "the balance on account in BB&T Account Number . . . 6828, but not less than $1,065,541,96." *See*, **Preliminary Forfeiture**

**Order, ¶ 1(a).**  The sum of $1,065,541.96 was in fact seized and is currently in the custody of the U.S. Marshals Service.  ***See*, Affidavit of Special Agent Cathleen Whiteman, filed April 11, 2006, ¶ 4; Process Receipt and Return, filed July 13, 2005.**

On May 10, 2005, Petitioner filed her petitioner opposing the forfeiture asserting, *inter alia*, that approximately $813,000 of the funds seized from BB&T Account # 6828 belonged to her as a "bona fide purchaser for value and without notice," and that the Order of Forfeiture should be amended so as to recognize her interest in such sum.  The Government subsequently filed a response, motion to dismiss, and (in the alternative) motion for summary judgment, to which Petitioner has filed her reply.  ***See*, Response to Third-Party Petition of Carol Ann Cox, Motion to Dismiss, and (in the alternative) Motion for Summary Judgment ("Government's Response"), filed October 14, 2005; Third-Party Petitioner's Reply to Plaintiff's Alternative Motion to Dismiss and/or Motion for Summary Judgment ("Petitioner's Reply"), filed February 7, 2006.**  A hearing on this matter was held May 15, 2006, there are no disputed issues of fact that would preclude judgment, and the matter is ripe for adjudication.

## II. LEGAL STANDARD

Pursuant to 18 U.S.C. § 982(a)(2), the Government is entitled to seek forfeiture of property that constitutes or is traceable to the proceeds of bank fraud.  Forfeitures of property under § 982 are governed by the provisions of 21 U.S.C. § 853.  **21 U.S.C. § 982(b)(1).**  Under § 853, the Government is vested with "[a]ll right, title, and interest" in the subject property immediately "upon the commission of the act giving rise to forfeiture[.]" **21 U.S.C. § 853(c).**  A transferee of property subject to forfeiture can be required to disgorge such property to the Government "unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section" (hereinafter referred to as "bona fide purchaser for value and without notice").  **21 U.S.C. § 853(c).**  The transferee must establish her status as a "bona fide purchaser for value and without notice" by a preponderance of the evidence.  **21 U.S.C. § 853(n)(6).**

In determining whether a petitioner is entitled to protection pursuant to 21 U.S.C. § 853(n)(6)(B), the Fourth Circuit Court of Appeals has held that the term "bona fide purchaser for value" must be construed broadly.

> We conclude that in order to effectuate legislative intent the term "bona fide purchaser for value" must be construed liberally to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return. If such persons are without knowledge of the potential forfeitability of the defendant's assets, they are entitled to recover under § 853(n)(6)(B).

*United States v. Reckmeyer*, **836 F.2d 200, 208 (4th Cir. 1987).**

Petitioner must, therefore, establish three propositions by a preponderance of the evidence in order to warrant protection under § 853(n)(6)(B) as a bona fide purchaser:

> (1) That she gave value in return for the property subject to forfeiture, and that she did so with the expectation that she would receive equivalent value in return;
>
> (2) That such exchange occurred in an arms-length transaction; and
>
> (3) That at the time she gave value in an arms-length transaction, she was reasonably without cause to believe that the property was subject to forfeiture under § 853.

If Petitioner is able to satisfy her preponderance burden as to these three requirements, the Order of Forfeiture should be amended so as to protect her interest in the property. *See*, **21 U.S.C. § 853 (n)(6).**

## III. ANALYSIS

This case presents the novel issue[4] of whether a spouse who receives property in an arbitration award, rendered in order to effectuate the equitable distribution of the marital estate and pursuant to a binding arbitration provision, can be considered a "bona fide purchaser for value and without notice" in such property so as to defeat the Government's forfeiture interest. The Court concludes that such person can be a "bona fide purchaser for value and without notice," and that in this case Petitioner does so qualify.

Before addressing the specific requirements necessary to be considered a "bona fide purchaser for value and without notice" under the forfeiture statute, the Court will dispose of two issues to which a fair amount of discussion was directed at the hearing in this case, but which the Court finds immaterial to the present dispute. First, much debate was carried on regarding Petitioner's ability or inability to undo the arbitration in

---

[4] Petitioner has also asserted a right to certain "legitimate proceeds" in the BB&T Account. *See,* **Third-Party Petition Opposing Forfeiture, ¶¶ 15-21.** Although the Court would be inclined to agree with Petitioner's position, because Petitioner is entitled to no more than $812,000 from the BB&T Account, and the Court has concluded that Petitioner is entitled to such sum as a "bona fide purchaser for value and without notice," the Court does not address Petitioner's alternative argument.

some manner and obtain a different award.  While the Court finds such action unlikely, given the content of the binding arbitration provision in the Collaborative Law Agreement and the Arbitration Stipulations as well as the particular provisions of North Carolina law, whether such action is possible is irrelevant.  The question here is whether Petitioner can be considered a "bona fide purchaser for value and without notice."  Whether the arbitration can be reopened no more *undermines* her ability to be considered as having such status than does the fact that the Government can seek substitute assets *strengthen* her ability to be so considered.

Second, while repeatedly referenced, the presence of Wachovia Bank as a potential victim in this case is irrelevant to the instant inquiry. While in no way intending to minimize any damages Wachovia may have suffered, such damages simply do not factor into a determination of whether a petitioner is a "bona fide purchaser for value and without notice." Furthermore, reliance on Wachovia's potential status as a victim deserving of restitution is in many ways a "red herring," as the Government stated in no uncertain terms in Defendant's plea agreement that it was under no obligation to use the forfeited funds for restitution purposes.  ***See, Plea Agreement, ¶ 6(a).***

Having cleared away these preliminary matters, the Court will now turn to a consideration of the specific requirements Petitioner must establish by a preponderance of the evidence in order for this Court to grant her Petition.

## A. Purchaser for Value

### (1) Value Given

Petitioner must first establish that she gave value in return for the property the Government now seeks to have forfeited.  Petitioner argues that she gave value in the form of her relinquishment of rights in the marital and divisible property awarded to Defendant in the equitable distribution decision by the arbitrator.  Such value included any and all right, title, or interest in: a life insurance policy; 50 percent of the proceeds from the sale of a boat, a jet ski, and other similar vehicles; and "over $510,000 in monies owed by Dr. William Van Ness to Dr. Cox or his businesses[.]" **Third Party Petition Opposing Forfeiture, at ¶ 44.**  The Government argued[5] that because an arbitrator made the final decision as to which

---

[5] The Government's principal argument prior to the hearing appeared to be that "[Petitioner's contention] appears to be unsupported by any authority[.]"  **Government's Response, ¶ 18.**  However, while Petitioner

asset would be included in each party's share of the marital estate, there was no "bargaining" and therefore no "value." The Government's argument makes, and correctly so, two necessary leaps: (1) "value" means "consideration," and (2) "consideration" requires a "bargained-for exchange." **See, *Black's Law Dictionary* 1550 (7th ed. 1999) (defining "value" as "[s]ufficient contractual consideration"); *Cline v. Dahle*, 149 N.C. App. 975, 563 S.E.2d 307 (table), 2002 WL 857552, \*\*\*4 (2002) ("Without this reciprocity of inducements – characterized as a 'bargained-for exchange' – no consideration exists to support the contract.").** However, the Court finds that the leap from these propositions to the Government's ultimate conclusion requires taking a view of both the law and facts that is unnecessarily and unreasonably narrow.

Certainly Petitioner and Defendant did not sit down together on February 24, 2005, and haggle over every asset, trading one for the other until the marital estate was completely divided. However, what did occur

---

may not have cited any case law specifically holding that an individual in her position *is* a "bona fide purchaser for value" under the forfeiture statute, the Government cites no cases establishing, as a matter of law, that she *is not*.

on that date – an arbitrator determining which party received which particular asset – was simply the culmination of a bargained-for exchange that was struck when Petitioner and Defendant executed a binding arbitration provision as a part of their Collaborative Law Agreement.  By such provision, Petitioner impliedly promised Defendant that she would give up all of her right, title, and interest in the property awarded to him by the arbitrator in exchange for, and to induce, an equivalent return from Defendant.  There is no requirement that the "bargaining" occur at the *exact* moment the items constituting the consideration are exchanged, nor is there a requirement that the parties know at the time of bargaining the identity of the exact assets in which they would be gaining or relinquishing rights as part of their bargained-for exchange of value.  ***See, e.g., Boles v. Caudle*, 133 N.C. 528, 534, 45 S.E. 835, 838 (1903) (recognizing as "consideration" sufficient to enforce a contract the giving of "all right, title, and interest" the defendant had in the estate of a decedent, when the "bargaining" for such interest occurred *ten years* prior to the decedent's death and when, quite obviously, neither party could know the exact nature or value of the interest at the time of bargaining).**

The Court finds that it is appropriate to look beyond February 24, 2005, for evidence of whether a bargained-for exchange transpired; doing so is in keeping with both general contract law principles and the Fourth Circuit's mandate that "bona fide purchaser for value" be given a broad interpretation. ***Reckmeyer, supra***; *see also*, ***Boles, supra***; ***Byerly v. Duke Power Co.*, 217 F.2d 803, 808-09 (4th Cir. 1954) (Parker, C.J., dissenting) (consideration "may consist of *any* act or forbearance constituting benefit to the promisor or detriment to the promisee" (emphasis added))*; FDIC v. Malin*, 802 F.2d 12, 19-20 (2d Cir. 1986) (recognizing that giving up rights in assets when dividing a marital estate can constitute consideration).** The Court, therefore, finds that Petitioner has established by a preponderance of the evidence that she gave value for the disputed asset.


**(2) Expectation of Receiving Equivalent Value**

Next, the Petitioner must establish that she had an expectation of receiving equivalent value in return for the value she relinquished. The Court finds that Petitioner had such expectation. In North Carolina, by statute, there is a presumption that what is "equitable" in the context of

equitable distribution is an *equal* distribution of the marital and divisible assets. **See, N.C. Gen. Stat. § 50-20(c); *Forsyth Memorial Hosp., Inc. v. Chisholm*, 342 N.C. 616, 620, 467 S.E.2d 88, 90 (1996).** Therefore, it would appear beyond dispute – and the Government has offered none – that Petitioner had an expectation of receiving equivalent value for the value she provided Defendant.[6]

## B. Arms-Length Transaction

Having determined that Petitioner gave value with the expectation of receiving equivalent value in return, the Court must now consider whether Petitioner has established by a preponderance of the evidence that the exchange of value occurred as the result of an arms-length transaction. Essentially, the Government argues that because Petitioner and Defendant were husband and wife, the transaction cannot be considered "arms-length." **See, Government's Response, ¶ 17.** However, the relevant

---

[6] Further support of such finding is found within the Arbitration Decision where the arbitrator made specific findings, consistent with the North Carolina statutes, in order to justify his decision that an unequal award was nevertheless equitable. Clearly the arbitrator, like the parties, was operating under the default starting point of "equal" is "equitable." **See, Arbitration Decision, ¶¶ 61-64.**

consideration in determining whether a transaction was conducted at arms-length is not the characterization of the parties, but rather the characteristics of the transaction.  "An 'arm's length transaction' is a 'transaction between two parties, *however closely related they may be*, conducted as if the parties were strangers, so that no conflict of interest arises.'" ***Fuisz v. Lynch*, 147 Fed. Appx. 319, 323 n.6 (4th Cir. 2005) (quoting, *Black's Law Dictionary* 1535 (8th ed. 2004)) (emphasis added); *see also*, *Estate of Waters v. C.I.R.*, 48 F.3d 838, 848-49 (4th Cir. 1995) ("'Property settlements in contemplation of divorce . . . are usually the product of arm's-length bargaining negotiations[.]'" (quoting, *McMurtry v. Commissioner*, 203 F.2d 659, 662 (1st Cir. 1953))).**

In considering the characteristics of the transaction that took place in this case, the Court has no doubt that it was "arms-length."  First, it is apparent the Petitioner and Defendant have no affection for one another.  For years, the Defendant was unfaithful in his marriage to Petitioner; he funneled money away from his wife (Petitioner) and children to his mistress; and he hid assets from his family.  This is clearly not a case, like

those cited by the Government, of a husband and wife colluding in order to avoid the effects of the forfeiture statute.

Second, Petitioner and Defendant were represented by separate counsel at all relevant times, and opposed one another at every turn throughout the entire process in order to retain every right, benefit, and asset possible while allowing no assets to be placed in the other's share of the marital estate by consent. Additionally, the best evidence that there was no marital collusion is that an arbitrator made the ultimate determination as to which particular assets would comprise each party's share of the marital estate.

Taking all of these facts into consideration, the Court finds that Petitioner has established by a preponderance of the evidence that the transaction in which she gave value with the expectation of receiving equivalent value occurred at arms-length.

## C. Without Notice

Finally, Petitioner must establish that at the time she gave value in an arms-length transaction, she was reasonably without cause to believe that the property was subject to forfeiture. "[T]he proper test to be applied

under the statute is not merely whether the petitioner had knowledge of the forfeitability of the asset but whether the petitioner *reasonably* held the belief that the property was not subject to forfeiture." **Reckmeyer, 836 F.2d at 204 (emphasis added).**

Petitioner asserts that she had no cause to believe that the property was subject to forfeiture and that such belief was reasonable. The Government, on the other hand, asserts that her belief was not reasonable. To support their argument, the Government relies on the letter provided to Petitioner's counsel by Defendant's domestic counsel (and originating from Defendant's criminal counsel in Florida) during the arbitration proceedings. The Government argues that although the letter refers only to health care fraud and forfeiture, it nevertheless negates any reasonableness in Petitioner's belief because it references the "substitute asset" provision of the forfeiture statute. **See, Exhibit 9, March 29, 2004, Letter from Attorney Gabriel L. Imperato to Attorney David W. Erdman ("March 2004 Letter"), *attached to* Ancillary Stipulations, at 2.** The Court disagrees.

While the letter relied upon by the Government does briefly refer to the "substitute asset" provision, its explanation of such provision is

extremely cursory. *Id.*, at 2. Furthermore, while such two-sentence explanation is framed in generic terms, those portions of the letter speaking directly to Petitioner's position and how she may be affected by the forfeiture statute speak only to forfeiture of actual fraudulently obtained assets. *Id.* **("Thus, if the Government *seeks to seize Dr. Cox's alleged fraudulently obtained assets*, a former spouse such as Mrs. Cox may become a claimant if she were to retain such assets." (emphasis added); "[T]he statute provides that after a judgment of forfeiture is entered against Dr. Cox, *title to the illegally obtained property* is retroactively presumed to vest in the Government, thus undermining the claims to the property of <u>any third party</u>." (Italics-emphasis added)).** Even the concluding paragraph of the letter refers to "the rights of the Federal government to forfeit *proceeds traceable to the commission of an offense* or enjoin the disposition of such assets." *Id.*, at 3 **(emphasis added).**

Furthermore, weighing against whatever limited value may be found in the March 2004 Letter are the following stipulated facts: (1) Petitioner had no knowledge that Defendant had committed bank fraud, or was even under investigation for bank fraud; (2) Petitioner knew only that Defendant

was being investigated for health care fraud; and (3) Until the time that he pled guilty, Defendant maintained his complete innocence to Petitioner, even proffering the testimony of retired FBI agent Robinson to the effect that the Government had no case against Defendant.  **See, Ancillary Stipulations, ¶¶ 3, 30, 40, 44.**

Taking account of all of these circumstances, the Court does not find it unreasonable that a person in Petitioner's situation would not have had cause to believe that the proceeds *from a sale of real property* she held as tenants by the entirety with her husband would be subject to forfeiture as a result of alleged instances of *health care fraud* committed by her husband. Much like the petitioner in *Reckmeyer*, "[t]he events known by [Petitioner] were susceptible to a number of interpretations," and, "[u]nderstandably, [s]he may not necessarily have assumed the worst from the limited information available to [her]."  ***Reckmeyer,* 836 F.2d at 205.**  The Court, therefore, finds that Petitioner has satisfied her burden of showing by a preponderance of the evidence that she was reasonably without cause to believe the property was subject to forfeiture at the time she gave value in an arms-length transaction.

Having concluded that Petitioner gave value for the forfeited property, that she did so with the expectation of receiving equivalent value in return, that such exchange occurred as the result of an arms-length transaction, and that she was reasonably without cause to believe at the time that the property was subject to forfeiture, the Court finds that Petitioner is entitled to the protections of 21 U.S.C. § 853(n)(6)(B) as a "bona fide purchaser for value and without notice."

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Government's motion to dismiss and (in the alternative) motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Third Party Petition Opposing Forfeiture is **GRANTED**, and the Preliminary Order of Forfeiture, entered April 11, 2005, shall be appropriately amended to reflect Petitioner's superior right to the sum of $812,000 formerly located in a BB&T Account ending in the number 6828 and seized from such account by the United States Marshals Service pursuant to the Preliminary Order of Forfeiture.

**IT IS FURTHER ORDERED** that the sum of $812,000, plus interest thereon from date of seizure until paid in full, shall be refunded by the United States Marshals Service to Petitioner.

**IT IS FURTHER ORDERED** that this Order is hereby **STAYED FOR A PERIOD OF 60 DAYS** from entry herein in order to allow the Government to file an appeal of this ruling if it wishes to do so.

**IT IS FURTHER ORDERED** that, if at the end of the 60-day period no appeal has been filed, the Government shall present the Court with an amended Preliminary Order of Forfeiture and all monies due the Petitioner shall be refunded to her forthwith.

Signed: May 23, 2006

Lacy H. Thornburg
United States District Judge